DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6747
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>RANDY LEE WALKER,<br><br>    Defendant. | CASE NO. CR 19-715-2 WHA<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

### I. INTRODUCTION

The defendant stands before the Court to be sentenced on March 2, 2021, after pleading guilty to Count One of the above-captioned Superseding Indictment, charging him with Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 846, 841, and 841(b)(1)(C). The government concurs with the description of the Defendant's conduct in the Presentence Report ("PSR"), the Guidelines calculation, and the advisory Guidelines range. The government recommends that the Court impose a sentence that takes into consideration the seriousness of the Defendant's conduct, specifically the fact that fentanyl—and in particular counterfeit pills laced with fentanyl—has caused numerous overdoses and deaths in the Northern District of California and around the country. The government also recommends that the Court's sentence take into consideration the Defendant's minimal role in the offense and his

particular mitigating circumstances.  The government does not make a specific recommendation with respect to the appropriate sentence.

## II. THE GOVERNMENT REQUESTS THAT THE COURT IMPOSE A SENTENCE FOR DEFENDANT THAT BALANCES ALL OF THE 3553(A) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  As the Ninth Circuit has held, Courts should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id*.  The Sentencing Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Kimbrough*, 552 U.S. 85, 108 (2007) (quoting *United States v. Gall*, 552 U.S. 38, 49 (2007)), and are to be kept in mind "throughout the sentencing process." *Gall*, 552 U.S. at 50, n. 6.  As noted by the Ninth Circuit, the Supreme Court has "clarified that we may attach a presumption of reasonableness to sentences falling within the Guidelines range." *United States v. Saeturn*, 504 F.3d 1175, 1178 (9th Cir. 2007) (emphasis added).  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.  Here, the Sentencing Guidelines place the "starting point" and "initial benchmark" at 2-8 months (after application of the Guidelines reduction due to the Defendant's eligibility for Safety Valve under the First Step Act).

Beyond the Guidelines, under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for defendant, the Court should consider these factors, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need for the sentence imposed to protect the public from further crimes of the defendant;

(5) the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A. **The Defendant's Conduct**

With respect the nature and circumstances of the offense, the Defendant was friends with his co-defendant, Jose Loza. The government began investigating Mr. Loza for narcotics trafficking in 2019, and on or about August 22, 2019, set up an operation for a confidential informant ("CI") to buy counterfeit, fentanyl-laced pills from Loza. At the arranged time and place of the deal, Mr. Loza provided the CI with five counterfeit "M30" pills (which are made to look like legitimate 30 mg Oxycodone pills) laced with fentanyl. The CI reminded Mr. Loza that their deal was for more pills, and Mr. Loza reached out to the defendant, Randy Lee Walker, by phone. A short time later, Mr. Walker arrived at the scene and provided Mr. Loza with a duffel bag. Mr. Loza then reached into the duffel bag and provided the CI with 45 more fentanyl-laced pills (for a total of 50 pills sold). The government does not have evidence to suggest that Mr. Walker knew that the duffel bags contained fentanyl-laced pills specifically, only that he knew that he was delivering narcotics to Mr. Loza for him to sell.

The government's investigation of Mr. Loza continued for months after the August 22, 2019 purchase, and included multiple controlled purchases of narcotics, including purchases and seizures of significantly more fentanyl-laced pills from Mr. Loza. However, the August 22, 2019 purchase was the only time that the government's investigation revealed that Mr. Walker was involved in Mr. Loza's narcotics trafficking activities. Moreover, the government executed a search warrant at Mr. Walker's home at the time of arrest and seized and searched his cell phone. The government found no additional evidence that Mr. Walker was involved in narcotics trafficking, either with Mr. Loza specifically or more generally. In sum, the evidence in this case shows that on one occasion, the Defendant delivered a bag containing 45 counterfeit, fentanyl-laced pills at the behest of his co-defendant, Mr. Loza, which Loza then sold to a CI.

**The Danger of Fentanyl, Generally**

As stated above, the Defendant dropped off 45 fentanyl-laced pills on behalf of Jose Loza, who them sold them to a person whom Mr. Loza presumably thought would use or sell those pills. Even though his role in the offense was minimal, the defendant participated in the trafficking of fentanyl, which has deadly consequences. By now, the Court well understands that fentanyl is the most dangerous drug to afflict our community in decades. Fentanyl typically is dosed in micrograms (millionths of a gram), see https://www.drugs.com/illicit/fentanyl.html, and can be lethal in quantities as

small as 250 micrograms, or 0.00025 grams, see https://www.harmreductionohio.org/how-much-fentanyl-will-kill-you-2/ ("HRO") (noting that, before an average surgery, anesthesiologists will administer a total of just 50 mcg [0.00005 g] of fentanyl) (last visited September 10, 2020). A dose of 2,000 micrograms – just 2 milligrams (0.002 g) – is usually fatal to those without opioid tolerance. Id. To appreciate just how little fentanyl that is, DEA prepared a photo showing what 2 milligrams looks like:

The equivalent of just a few grains of salt is enough fentanyl to be deadly. It is easy to understand how a drug so lethal has become the "Third Wave" of the drug overdose crisis that has gripped this nation for the past two decades and now claims between 65,000 and 70,000 lives each year. See Hedegaard, H., et al, "Drug Overdose Deaths in the United States, 1999-2018," at https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf (67,367 deaths in 2018, the most recent year with complete data) (last visited June 17, 2020). Fentanyl alone accounted for almost half of those deaths. See "Drug and Opioid-Involved Overdose Deaths – United States, 2017-2018," in Morbidity & Mortality Weekly Report (Mar. 20, 2020) at https://www.cdc.gov/mmwr/ volumes/69/wr/mm6911a4.htm ("MMWR II") (last visited June 17, 2020). Just a few years ago, fentanyl accounted for a fraction of the deaths it claims today: in 2014, the overdose death rate from fentanyl was just 1.0 per 100,000 persons, see "Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014," in Morbidity & Mortality Weekly Report (Jan. 1, 2016) at https://www.cdc.gov/ mmwr/preview/mmwrhtml/mm6450a3.htm ("MMWR I") (last visited June 17, 2020); in 2018, the overdose death rate from fentanyl had climbed to 9.9 per 100,000, see MMWR II. Indeed, while the overdose death rates due to other opioids remained stable or decreased slightly between 2017 and 2018, the death rate from fentanyl increased 10%. MMWR II.

GOVT SENT. MEM.
CR 19-715-2 WHA
4

In the Bay Area, fentanyl overdose deaths are skyrocketing. In San Francisco alone, more than half of the 441 overdose deaths in the city in 2019 were due to fentanyl, and that number is expected to rise even more in years to come. See https://www.sfchronicle.com/politics/article/More-than-one-person-a-day-died-in-SF-of-an-15529006.php (last visited Feb. 23, 2021). There is also mounting evidence that fentanyl-related overdose deaths are spiking during the COVID-19 pandemic, as individuals turn to drugs to combat loneliness, anxiety, and depression. And because fentanyl is a powder, and so potent, it is finding its way into other drugs – including methamphetamine, cocaine, heroin, and in this case, counterfeit Oxycodone pills – and killing those who never suspected they were ingesting fentanyl.

An opioid overdose death – including death from fentanyl – is tragic and awful. Opioids, like fentanyl, depress respiration, resulting in slower, shallower breathing. The body fights against the lack of oxygen and buildup of carbon dioxide, often resulting in rattling gasps as a frothy fluid begins to fill the lungs and airways. Eventually, the victim's organs begin to fail from lack of oxygen, and then his heart stops. There is nothing about this process, which can occur in minutes or take up to half an hour, that can be called peaceful.

There is an "antidote" to opioid overdoses – naloxone – which temporarily displaces the opioids from the opioid receptors in the brain and elsewhere and thereby reverses the opioids' effects on the body. But fentanyl acts so quickly and is so strong, that first responders often cannot arrive soon enough to revive someone who has overdosed on fentanyl. Even if they arrive in time, reviving someone from a fentanyl overdose may take many doses of naloxone – more than they carry.

The defendant provided his friend Mr. Loza with lethal poison so that it could be distributed. By his actions, he increased the chances that an American would take a fentanyl pills and overdose (although, as stated above, the government does not have evidence that this Defendant was aware that he provided Mr. Loza with fentanyl-laced pills specifically). Any pill the Defendant provided could have been sold and become the last for someone. Even if fentanyl does not cause death, it feeds addictions and drug dealers profit from its use. While the Defendant may not have known exactly what was in the bag he gave to Mr. Loza, he nevertheless participated in what has become an increasingly deadly epidemic in this country.

**B. The Defendant's Minimal Role and Mitigating Circumstances Present in This Case**

While the evidence shows that the Defendant was involved in the distribution of narcotics with Loza, he was a very minimal participant in a larger conspiracy. The government investigated Loza, a large-scale trafficker, for months and conducted multiple controlled purchases of narcotics from him; the Defendant was involved in only one sale of drugs—the first sale pills to the CI on August 22, 2019. That controlled purchase was the smallest operation conducted by the government in this case, and the evidence shows that the Defendant delivered only 45 counterfeit fentanyl-laced pills to Loza. Furthermore, there is no evidence that the Defendant knew that what he was delivering was fentanyl or counterfeit pills; he only knew that what he provided Loza was narcotics.

The government's evidence that the Defendant participated in a conspiracy with Loza is limited to that one sale of narcotics on August 22, 2019. When the government arrested the Defendant, agents searched his home and seized and searched his cell phone but found no additional evidence that the Defendant was engaged in narcotics trafficking, suggesting that the Defendant's delivery of drugs to Loza was aberrational behavior. In this way, the Defendant's conduct in this case is perhaps even less culpable or serious than that of a typical "drug runner," as the Defendant did not work repeatedly for Mr. Loza or any other drug dealer, but rather only delivered drugs once. Nor does the government have evidence that he was compensated for doing so. Furthermore, the Defendant never had or exercised decision-making authority in the conspiracy; he took instruction from Loza and delivered narcotics on Loza's behalf. For these reasons, the government agrees that the Defendant should receive a four-level decrease to his Guidelines calculation for being a minimal participant in the conspiracy, pursuant to U.S.S.G. § 3B1.2(a).

With respect to the Defendant's history and characteristics, the PSR describes the Defendant's troubled and difficult upbringing, including witnessing domestic violence and the murder of his brother and death of his father. The Defendant has also struggled with addiction and substance abuse throughout his life. With respect to his criminal history, Defendant has seven prior adult convictions, but only one of them is relatively recent (for willfully discharging a firearm in a negligent firearm in 2017), leading to him being in Criminal History Category III, as he committed the instant offense while on supervision.

The government notes that the Defendant has behaved well on pretrial release, with his only

GOVT SENT. MEM.  
CR 19-715-2 WHA

6

violations stemming from his use of marijuana. Defendant also pled guilty early in this litigation, has accepted responsibility for his actions, and expressed remorse for his actions.

While the government acknowledges that the Defendant played only a minimal role in this narcotics conspiracy, the Defendant participated in the trafficking of narcotics, which has caused immense harm in our community and led to addiction, overdose, and death. The Defendant is lucky that the counterfeit fentanyl pills he gave to Loza were in fact sold to a CI. If they were not, they could have caused a user to overdose and die. Counterfeit pills laced with fentanyl are particularly dangerous because the user believes that he or she is taking a different, less potent narcotic, and often does not know that he or she is ingesting fentanyl. That can lead to users ingesting large and potentially fatal amounts of fentanyl. The Defendant chose to help his codefendant, Jose Loza, distribute these deadly pills. The Court's sentence in this case should send a message to those who are considering making the same error.

### III. CONCLUSION

The government respectfully requests that the Court impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

DATED: February 23, 2021

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney


_____/s/_____
ROSS WEINGARTEN
Assistant United States Attorney